UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 13-cv-7576 (RJS)

---

RAYMOND T. KIM,

Plaintiff,

VERSUS

KOREA TRADE PROMOTION-INVESTMENT AGENCY (a/k/a "KOTRA"), *et al.*,

Defendants.

---

OPINION AND ORDER
September 11, 2014

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff Raymond T. Kim ("Plaintiff") brings this action against Defendants Korea Trade Promotion-Investment Agency ("KOTRA"), Sung Pil Um ("Um"), and Sung Hun Lee ("Lee," and collectively with KOTRA and Um, "Defendants"), asserting numerous claims of discrimination and retaliation pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.* Now before the Court is Defendants' motion to dismiss all claims for lack of subject matter jurisdiction based on sovereign immunity. For the reasons set forth below, the Court grants Defendants' motion.

I. BACKGROUND

A. Facts

Plaintiff is a United States citizen who had worked for KOTRA for thirty-five years prior to his termination in April 2013.[1]

---

[1] All facts are taken from Plaintiff's Amended Complaint (Doc. No. 10 ("Am. Compl.")) and, where appropriate, the parties' joint stipulation of facts (Doc. No. 24 ("Stip.")). In deciding Defendants' motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 22 ("Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 30 ("Opp'n")), Defendants' reply memorandum of law (Doc. No. 35 ("Reply")), and the documents submitted in support thereof (Doc. Nos. 23, 25–29, 36–38). However, the Court did not consider the reply declaration of Bong Rak Choi (Doc. No. 39), which Defendants withdrew on May 12, 2014 (Doc. No. 47).

(Am. Compl. ¶¶ 1, 8, 27.) KOTRA – an unincorporated company registered under the Foreign Agent Registration Act of 1938, 22 U.S.C. §§ 611–621 (Am. Compl. ¶ 2) – is a non-profit agency of the Korean government, established under a Korean law, the Korea Trade-Investment Promotion Agency Act (Stip. ¶ 1). Defendants Um and Lee are Korean nationals currently serving as President and Deputy Director of KOTRA, respectively. (Am. Compl. ¶¶ 3–4, 10.) Um resides in New York, and Lee resides in New Jersey. (*Id.* ¶¶ 3–4.)

The President of the Republic of Korea appoints the officers and directors of KOTRA, and the Korean Minister of Commerce, Industry, and Energy exercises supervisory authority over KOTRA. (Stip. ¶¶ 4–5). KOTRA was established "for the purpose of promoting development of the Korean national economy by providing services to Korean industries and enterprises" (Stip. ¶ 1), and its mission is to act as a local office for various Korean commercial entities by facilitating the sale of their goods and services in the United States (Am. Compl. ¶ 11). On behalf of "Korean corporations, commercial entities, and exporters in Korea," KOTRA offers a variety of services, such as conducting market research, preparing target client lists, maintaining contact with brokers, planning conferences and meetings, and conducting on-site inspections. (*Id.*) The Korean government provides KOTRA's capital, but KOTRA is also authorized to charge fees to parties that receive the benefit of KOTRA's services. (Stip. ¶ 2.) In fact, Korean entities substantially fund KOTRA's activities in the United States, with over 1,000 entities each paying in excess of $3,000 in annual fees for KOTRA's services. (Am. Compl. ¶ 12.)

Plaintiff began his employment with KOTRA in 1977 with the job title of Assistant Staff; his responsibilities included researching and identifying potential buyers for Korean exporters, as well as guiding exporters to buyers in New York and throughout the United States. (Stip. ¶ 8.) Plaintiff held the position of Assistant Marketing Manager beginning in June 1988 and was "assigned to work in a marketing program initiated by KOTRA whereby KOTRA would act as a branch office to Korean corporations and exporters seeking to sell goods and services in the United States." (*Id.* ¶10.) Plaintiff's position changed again in August 1999, when he became a "Marketing Manager," and in August 2008, when he became a "Marketing Consultant" (*id.* ¶ 11) – changes that Plaintiff characterizes as promotions (Am. Compl. ¶ 16). On February 1, 2012, Plaintiff received an offer letter confirming his position as Marketing Consultant, the responsibilities of which included "Korea Trade and Marketing Function." (Stip. Ex. B ("2012 Offer Letter").)

According to Plaintiff, in December 2012, Um called Plaintiff into his office and asked him to resign from his job "like most people in Korea do at age [sixty]" because "the workload seemed burdensome for [Plaintiff] given his age." (Am. Compl. ¶ 18.) Um then "offered Plaintiff a temporary position with a [thirty-five] percent reduction in annual pay," explaining that Plaintiff was "lucky to keep a simple entry level job as an old man in a bad economy." (*Id.* ¶ 19.) In January 2013, Lee, acting at the direction of Um, prepared a resignation letter and required that Plaintiff sign it as a precondition to any continued employment with KOTRA, albeit in a temporary position with reduced salary. (*Id.* ¶¶ 21–22.) Lee also offered Plaintiff $15,000 to give up his position as a permanent employee. (*Id.* ¶ 22.) In January 2013, Plaintiff signed the resignation letter under emotional and financial duress. (*Id.* ¶ 23.) Thereafter, on February 1, 2013, Plaintiff received an offer

2

letter changing his position to "Specialist in Exhibitions" with responsibility for "marketing . . . exhibitions." (Stip. Ex. C ("2013 Offer Letter").) Within days, KOTRA replaced Plaintiff with Eric J. Park, "an employee substantially younger than Plaintiff." (Am. Compl. ¶ 28.)

In February 2013, Plaintiff filed an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 24.) When Um discovered that Plaintiff had filed a complaint, he screamed at Plaintiff and ordered him to quit immediately. (*Id.* ¶ 25.) According to Plaintiff, after that encounter with Um, his working conditions became intolerable. (*Id.*) Thereafter, Plaintiff advised the EEOC of the incident with Um (*id.* ¶ 26), and, on April 30, 2013, Plaintiff "accepted his firing by the Defendants and left" KOTRA (*id.* ¶ 27). On or about July 31, 2013, Plaintiff received a right-to-sue notice from the EEOC. (*Id.* ¶ 29.)

B. Procedural History

On October 25, 2013, Plaintiff initiated the instant suit by filing a Complaint against Defendants. (Doc. No. 1.) On December 20, 2013, Plaintiff filed an Amended Complaint. (Doc. No. 10.) Thereafter, on February 28, 2014, Defendants filed the instant motion to dismiss for lack of subject matter jurisdiction based on sovereign immunity. (Doc. No. 21.) The motion was fully submitted on April 14, 2014. (Doc. Nos. 22–30, 35–38.)

II. LEGAL STANDARD

A. 12(b)(1) Motion to Dismiss

On a motion to dismiss pursuant to Rule 12(b)(1), "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). While the court must generally "take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (citation and internal quotation marks omitted), jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *id.* (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)); *see also Figueroa v. Comm'r of Soc. Sec.*, No. 12-cv-7129 (LGS) (SN), 2013 WL 3481317, at *2 (S.D.N.Y. July 11, 2013) ("[N]o presumptive truthfulness attaches to the complaint's jurisdictional allegations." (citation and internal quotation marks omitted)). Moreover, "even on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009) (citation and internal quotation marks omitted). The Court may resolve "disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

B. Sovereign Immunity

"The [Foreign Sovereign Immunities Act ("FSIA")] provides the sole basis for obtaining jurisdiction over a foreign state in the courts of [the United States]." *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010)

3

(citation and internal quotation marks omitted). Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States" absent an applicable statutory exception. *See* 28 U.S.C. § 1604. "The FSIA defines 'foreign state' to include an 'agency or instrumentality' of a foreign state." *Kato v. Ishihara*, 360 F.3d 106, 110 (2d Cir. 2004) (quoting 28 U.S.C. § 1603(a)). In addition, "an individual official of a foreign state acting in his official capacity is . . . protected by the FSIA." *Matar v. Dichter*, 563 F.3d 9, 12 (2d Cir. 2009) (citation and internal quotation marks omitted). "The party seeking to establish jurisdiction bears the burden of producing evidence . . . that a specific exception to immunity applies, but the foreign state then bears the ultimate burden of persuasion on this question." *City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369 (2d Cir. 2006).

1. Waiver Exception

Germane to the instant motion, a foreign state may "waive[] its [sovereign] immunity either explicitly or by implication." *See* 28 U.S.C. § 1605(a)(1). "With respect to implicit waivers, the courts have found such waivers . . . [(1)] where a foreign state has agreed to arbitration in another country[,] . . . [(2)] where a foreign state has agreed that the law of a particular country should govern a contract, . . . [and (3)] where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (quoting H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617). In other situations, "courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous" or "unmistakable." *See id.* Indeed, the Second Circuit has explained that "the implied waiver provision of Section 1605(a)(1) must be construed narrowly." *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir. 1996) (quoting *Shapiro*, 930 F.2d at 1017); *see also Human Rights in China v. Bank of China*, No. 02-cv-4361 (NRB), 2005 WL 1278542, at *6 (S.D.N.Y. May 27, 2005) ("'[A] waiver will not be implied absent strong evidence of the sovereign's intent." (alteration in original) (internal quotation marks omitted) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993))).

2. Commercial Activity Exception

Another exception to sovereign immunity relevant here is the commercial activity exception, which applies when an "action is based upon a commercial activity carried on in the United States by the foreign state." *See* 28 U.S.C. § 1605(a)(2). Under the statute, "commercial activity" is defined to mean "either a regular course of commercial conduct or a particular commercial transaction or act[;] . . . [t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). "The House Report on the bill that became the FSIA explicitly asserts the congressional intention to leave to the 'courts . . . a great deal of latitude in determining what is a commercial activity'" under the FSIA. *Kato*, 360 F.3d at 110 (quoting H.R. Rep. No. 94-1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615).

According to the Supreme Court, "a state engages in commercial activity . . . [when] it exercises only those powers that can also be exercised by private citizens." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)) (internal quotation

4

marks omitted). The Second Circuit's description of the commercial activity exception in *Swarna* is particularly instructive:

> [T]o determine the applicability of the commercial activity exception, "we ask not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce."

622 F.3d at 147 (quoting *Anglo–Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 177 (2d Cir. 2010)); *see also Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods . . . ."). Moreover, "the fact that a government instrumentality . . . is engaged in *the promotion of commerce* does not mean that the instrumentality is thereby engaged in *commerce*." *Kato*, 360 F.3d at 112 (emphasis in original). In fact, "[t]he promotion abroad of the commerce of domestic firms is a basic – even quintessential – governmental function." *Id.*

### III. DISCUSSION

Because "[t]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country," *Swarna*, 622 F.3d at 143, Plaintiff must demonstrate that a specific exception to the FSIA's grant of sovereign immunity applies in order for the Court to have subject matter jurisdiction over Plaintiff's claims, *see* 28 U.S.C. § 1604 (explaining that, absent a statutory exception, "a foreign state shall be immune from the jurisdiction of the courts of the United States"). Plaintiff concedes that KOTRA is "a foreign government agency." (Opp'n at 1.) Nevertheless, Plaintiff argues that the Court has jurisdiction over his claims because both the waiver exception and the commercial activity exception of the FSIA apply to the instant case. (Opp'n at 1–3.) The Court will address each of these arguments in turn.

### A. Waiver Exception

Plaintiff argues that Defendants have implicitly waived their sovereign immunity by repeatedly manifesting an intention to have local laws govern KOTRA's contracts and disputes. (*See* Opp'n at 9 (quoting *Shapiro*, 930 F.2d at 1017 ("With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed . . . that the law of a particular country should govern a contract.")).) Specifically, Plaintiff contends that KOTRA (1) "openly directs its overseas offices to have local law 'govern' its employment contracts and related disputes" (Opp'n at 9) and (2) maintains a handbook representing to employees that they are protected by the anti-discrimination laws of the United States during the course of their employment (Opp'n at 10–11).

However, an implicit waiver must be "unmistakable" and "unambiguous," and the evidence before the Court suggests quite the opposite intent by KOTRA. *See Shapiro*, 930 F.2d at 1017 (explaining that the use of local governing law constitutes a waiver when it is "unmistakable," and that "courts have been reluctant to find an implied waiver where the circumstances were not . . . unambiguous."). Here, both the 2012 Offer Letter and 2013 Offer Letter provide that Plaintiff "shall observe all KOTRA's policies, procedures, rules and regulations, including, but not limited to, *those contained in the Employee Handbook,*

5

*which regulate the terms and conditions of [Plaintiff's] employment.*" (Reply at 8 (emphasis in original).) KOTRA's current handbook, which is applicable to employees working in New York, provides – in all capital and bold letters, on the very first page – that "NOTHING HEREIN IS INTENDED AS A[] WAIVER OF KOTRA'S SOVEREIGN IMMUNITY TO SUIT OR CLAIMS IN ANY SUCH COURT OR AGENCY." (*Id.* (quoting Reply Declaration of Tae Sik Han, dated Apr. 14, 2014, Doc. No. 36 ("Han Reply Decl."), Ex. D at 1); *see also* Han Reply Decl. Ex. D at 2 ("Equal employment opportunity notices [that] are posted near employee gathering places as required by law . . . are NOT intended as a waiver of KOTRA's sovereign immunity from suit in state or federal court, or in any administrative agency.").)[2] Given this explicit statement demonstrating KOTRA's desire to preserve its sovereign immunity, KOTRA's submission to the laws of the United States – which law includes the FSIA – cannot be reasonably characterized as an "unmistakable" or "unambiguous" waiver of its sovereign immunity. *See Shapiro*, 930 F.2d at 1017; *see also Human Rights in China*, 2005 WL 1278542, at *6 ("[A] waiver will not be implied absent strong evidence of the sovereign's intent.").

Plaintiff also contends that KOTRA explicitly argued in a separate legal proceeding in Korea that the labor laws of the United States should govern employment disputes between KOTRA and its American employees, and, consequently, that Defendants should be judicially estopped from asserting a contradictory position in this case. (*See* Opp'n at 10.) As evidence of the position taken by KOTRA in the Korean proceeding, Plaintiff points to a memorandum prepared by the Barun Law Firm in connection with "a Korean action involving severance payment claims brought against [KOTRA] by its former and present local U.S. employees." (*Id.* at 5 (citing Lee Decl. Ex. C).) Defendants vigorously dispute Plaintiff's claim, pointing out that not only did the Barun Law Firm not represent KOTRA in the Korean action but that the firm represented Plaintiff and other current and former KOTRA employees who were adverse to KOTRA. (*See* Reply at 10; Han Reply Decl. ¶ 39.) Having reviewed these materials, the Court finds that the memorandum does not provide "strong evidence of the sovereign's intent" to waive its sovereign immunity, particularly when coupled with the other evidence, discussed above, which similarly demonstrates that KOTRA sought to preserve its sovereign immunity.

B. Commercial Activity Exception

With respect to whether KOTRA's conduct falls within the commercial activity exception to the FSIA, the facts at issue here are strikingly similar to those at play in *Kato v. Ishihara*. In *Kato*, which was also a case involving claims of employment discrimination, the plaintiff was employed in the United States by the Tokyo Metropolitan Government ("TMG"), a Japanese governmental office that provided "product promotion for Japanese companies, general business development assistance, participation in trade shows on behalf of the [various] companies to promote those companies' products for sale, and leasing [of] office space to those companies for their

---

[2] Plaintiff relies on KOTRA's "Overseas Organization Local Employee Operating Guidelines" handbook. (*See* Declaration of Charles H. Lee, dated Mar. 31, 2014, Doc. No. 26 ("Lee Decl."), Ex. A.) However, by its terms, this overseas handbook does not "apply to Local Employees working in overseas organizations [where] separate provisions exist." (*Id.* art. 2.) Plaintiff is such an employee working in an overseas KOTRA office that maintains its own handbook. (*See* Han Reply Decl. ¶¶ 31–33.)

6

business development." 360 F.3d at 111. The plaintiff's job entailed responsibility for "promotional activities on behalf of Japanese companies, such as manning booths at trade shows to promote specific products . . . [and creating] marketing reports of interest to Japanese companies." *Id.* at 109. Noting that TMG "performed actions that were only superficially similar to actions typically undertaken by private parties," *id.* at 111, the Second Circuit determined that TMG's activities were governmental rather than commercial, explaining that even if "a private Japanese business might engage in these activities on its own behalf . . . such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general," *id.* at 112. Thus, the mere "fact that a government instrumentality like TMG is engaged *in the promotion of commerce* does not mean that the instrumentality is thereby engaged in *commerce*." *Id.* at 112 (emphasis in original). Key to the Second Circuit's holding was the recognition that foreign states and their instrumentalities do not engage in commerce when engaged in the promotion of domestic business. *See id.* ("The promotion abroad of the commerce of domestic firms is a basic – even quintessential – governmental function.").

Here, Plaintiff identifies numerous services offered by KOTRA that are virtually indistinguishable from the services offered by TMG. Specifically, Plaintiff alleges that KOTRA provided

> a full range of commercial and corporate services, including market research, preparing target client list[s], initiating and maintaining brokering contact, arranging and participating in conferences, on-site inspections and coordinating and attending out of state face to face meetings all in pursuit of a sole objective of successfully marketing and selling the goods and services of its Korean corporate clients.

(Am. Compl. ¶ 11.) According to Plaintiff, his own duties "were to research and identify buyers for Korean exporters . . . ." (*Id.* ¶ 13; *see also id.* ¶ 14 ("[Plaintiff] was also asked to consult [KOTRA's] Korean corporat[e clients] and to coordinate various trade shows and buyers['] meetings to actively assist the sale of goods in the United States on behalf of Korean exporters.").) Accepting Plaintiff's characterizations as true, the Court finds that KOTRA's activities are almost identical to the services provided by TMG in *Kato*, which the Second Circuit characterized as governmental rather than commercial. *See* 360 F.3d at 111–12.

Plaintiff also alleges, however, that KOTRA engages in the "marketing and selling [of] goods and services of its Korean corporate clients in the United States for the commercial benefits to its Korean corporate clients." (Am. Compl. ¶ 11.) Indeed, Plaintiff highlights these services in his opposition and attempts to re-characterize KOTRA's activities, in this respect, as primarily sales-based, thus falling within the scope of the commercial activity exception. (*See* Opp'n at 12–15.) Specifically, Plaintiff contends that KOTRA (1) concludes transactions on behalf of member entities, (2) assures actual sales to member entities, (3) issues annual directives with target amounts for export sales, (4) assigns members to local employees with individual sales targets, and (5) enforces a sales performance evaluation mechanism tied to the compensation and retention of employees. (*Id.*; *see also* Declaration of Raymond T. Kim, dated Mar. 31, 2014, Doc. No. 25 ("Kim Decl."), ¶ 5 ("KOTRA deploys operational, disciplinary, employment and compensation policies . . . all designed to compel sales like a sales agency.").) Plaintiff also argues that

7

his own conduct as an employee of KOTRA was "entirely sales related, that of a sales agent working for a sales agency engaged in commerce." (Opp'n at 15; *see also* Kim Decl. ¶¶ 5–14.)

As an initial matter, Plaintiff's recent characterization of KOTRA's activities, as well as his own employment, are at odds with contemporaneous accounts contained in the record. For example, on December 3, 2012, Plaintiff sent an email to Jaehong Sim – the Deputy General Manager of Namyung Lighting, a KOTRA client – describing KOTRA's functions in very different terms:

> Being a government agency and not a private corporation, *we cannot engage in marketing and sales activities in the United States (legally barred from using the term marketing and sales as well)*. The core of the branch office services we provide are (1) finding buyers[,] (2) introducing products, and (3) marketing support. If you joined the service thinking that the branch office service involves marketing and sales activities to sell products, you need to locate a sales agent who performs sales in the United States, and must discontinue your participation in the branch office service.

(Han Reply Decl. Ex. C (emphasis added).) Additionally, the contracts that KOTRA enters into with each member entity are consistent with the description set forth in Plaintiff's e-mail. Specifically, those contracts state that KOTRA will "provide to clients services regarding local market information, finding new buyers, export consultations, and on-site support for overseas business trips" (Han Reply Decl. Ex. B art. 4), but also make clear that "KOTRA . . . may not be legal prox[y] of the client or buyers" and exclude from the scope of services offered by KOTRA "[m]atters of contract signing by proxy, resolution of claims, and other matters involving legal liabilities and disputes" (*id.* art. 6). Furthermore, contrary to Plaintiff's assertion that he functioned purely as a "sales agent," the record reflects that Plaintiff's compensation, like that of other KOTRA employees, did not substantially depend on sales performance and was not "affected by the amount of sales that the member organization[] to which [Plaintiff was as]signed made." (Han Reply Decl. ¶ 23.) The declaration of Jaehong Sim further buttresses this conclusion. (*See* Declaration of Jaehong Sim, dated Apr. 10, 2014, Doc. No. 38 ("Sim Decl."), ¶ 11 ("Mr. Kim never made sales on behalf of Namyung Lighting, and never negotiated a contract on Namyung Lighting's behalf."); *id.* ¶ 12 ("Mr. Kim received no commissions from Namyung Lighting.").)   Thus, the Court finds that KOTRA did not, as Plaintiff contends, enforce a "sale[s] performance evaluation [program] that is explicitly connected to employees' compensation and even termination" (*see* Opp'n at 13), but merely took into account the "*exports promoted*" by the employee as one of more than thirty other factors relied on by KOTRA when evaluating employee performance (*see* Han Reply Decl. ¶¶ 18–22 (emphasis added); Kim Decl. Ex. E (attaching copy of KOTRA's form used for evaluating employees); *see also* Reply at 5–6*)*.

Perhaps most damaging to Plaintiff's contention that he was working as a sales agent for KOTRA are the facts that (1) KOTRA was assisting over fifty member organizations with their United States sales (Han Reply Decl. ¶ 5), and (2) KOTRA received no profits from the sales of its member organizations[3] (*id.* ¶ 24; Sim Decl. ¶

---

[3] Similarly, "[a]ll loss from KOTRA's activity is borne by the Korean government and no private person or entity shares in any potential profit that

8

12). These facts are entirely consistent with KOTRA's mission as a governmental agency dedicated to promoting the sales of Korean goods and services generally (*see* Stip. ¶ 7 ("KOTRA's sole purpose is the furtherance of Korean government policy in facilitating Korean trade and economic interests.")) – which is not something one would expect of a private sales agency. As the Second Circuit noted in *Kato*, being engaged in "*commerce*" and the "*promotion of commerce*" are not synonymous, with the latter being a "quintessential . . . government function." 360 F.3d at 112 (emphasis in original); *id.* (reasoning that a private party "would not typically undertake the promotion of [multiple businesses] or the promotion of [a foreign state's] business interests in general"). In light of all the circumstances reflected in the record before it, the Court has little difficult concluding that KOTRA – like TMG – is engaged in the "promotion of commerce," which is a governmental, rather than commercial, endeavor.[4]

## C. State and City Law Claims

Since 28 U.S.C. § 1604 "bars federal *and state courts* from exercising jurisdiction when a foreign state *is* entitled to immunity," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (first emphasis added), the FSIA provides the sole basis for the courts in the United States – both federal and state – to obtain jurisdiction over foreign government agencies, *see* 14A C. Wright & A. Miller, Fed. Prac. & Proc. § 3662 (4th ed. 2009) ("The FSIA is the sole basis for obtaining subject-matter jurisdiction over a foreign state, its agencies, or its instrumentalities, and sets forth the exclusive standards to be used in resolving questions of sovereign immunity in cases before both federal and state courts."). Consequently, the Court lacks jurisdiction, and Defendants are immune from suit pursuant to the FSIA for *all* of Plaintiff's claims – federal, state, and city.

---

might accrue to KOTRA." (Stip. ¶ 3; *see also* Declaration of Tae Sik Han, dated Feb. 28, 2014, Doc. No. 23 ("Han Decl."), ¶ 16 ("While KOTRA is authorized to charge a fee for its services, so the beneficiaries of the services bear the costs incurred, all losses from its activities are borne by the Korean Government and no private person or entity shares in any profits that might accrue to KOTRA.").)

[4] The Court also notes that some courts have required a "plaintiff's employment relationship [to have been] sufficiently intertwined with [the foreign state's governmental] activity [such that] the employment relationship itself was part of the government function" in order for a foreign entity to retain its sovereign immunity. *See, e.g.*, *Hijazi v. Permanent Mission of Saudi Arabia to United Nations*, 689 F. Supp. 2d 669, 675 (S.D.N.Y. 2010). Insofar as such a requirement exists, the Court finds that Plaintiff's employment was closely intertwined with KOTRA's governmental role of promoting the sale of goods and services offered by Korean firms. Plaintiff's function was not ancillary to KOTRA's promotion of Korean firms; rather, Plaintiff actively worked to facilitate that quintessentially governmental goal. (*See, e.g.*, Stip. ¶ 12 ("[Plaintiff's] job responsibilities included, but were not limited to: (i) working with Korean companies to assist them in marketing and promoting the Korean companies' products in the United States; (ii) providing market research and investment support to these companies; and (iii) introducing the Korean companies to new business contacts and potential buyers in the United States.").)

9

IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 21, and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 11, 2014
       New York, New York

\*   \*   \*

Plaintiff is represented by Barry I Fredericks, Esq. and Charles H. Lee, Esq., Fredericks & Lee, LLP, 1500 Palisade Avenue, Suite 7D, Fort Lee, New Jersey 01024.

Defendants are represented by Jonathan Stoler, Esq., Kevin Ronald Puvalowski, Esq., and Sean Joseph Kirby, Esq., Sheppard, Mullin, Richter & Hampton, LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10012.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/11/2014